UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. TIMOTHY M. REIF, JUDGE

| | |
|---|---|
| VIRTUS NUTRITION, LLC, | : |
| | : |
| | : |
| Plaintiff, | : |
| | :    Court No. 21-00165 |
| | : |
| v. | : |
| | : |
| THE UNITED STATES, | : |
| | : |
| Defendant. | : |
| | : |

**BRIEF OF *AMICUS CURIAE***
**AMERICAN APPAREL & FOOTWEAR ASSOCIATION**
**IN SUPPORT OF PLAINTIFF**

Patrick D. Gill
SANDLER, TRAVIS & ROSENBERG, P.A.
*Attorneys for Amicus Curiae*
675 Third Avenue, Suite 1805-06
New York, NY  10017
(212) 549-0156

# TABLE OF CONTENTS

INTEREST OF *AMICUS CURIAE*.................................................................................... 1

STATEMENT OF THE CASE........................................................................................ 3

SUMMARY OF ARGUMENT ...................................................................................... 4

ARGUMENT ................................................................................................................ 4

    A.    CBP's Regulations Introduced Uncertainty to Section 1307 Enforcement Actions Even Though the Statute Requires Certainty ........................................................................ 4

    B.    CBP's System to Detain and Exclude Goods Lacks Procedural Due Process................. 7

    C.    CBP Has Imposed an Unreasonable Standard of Evidence. ........................................... 9

        *1.*    *Importers are operating in a vacuum created by CBP's flawed regulations.* ........... 10

        *2.*    *CBP's continuously shifting documentary requirements lead to greater confusion.* . 12

        *3.*    *CBP provides little to no feedback to importers during the WRO administrative process.* ............................................................................................................ 13

    D.    CBP's Process Lacks Transparency .............................................................................. 15

    E.    CBP's Process is Arbitrary and Capricious.................................................................... 17

        *1.*    *CBP forced labor enforcement actions favor quantity over quality* ........................... 18

        *2.*    *CBP inconsistently applies* de minimis *standards in WRO enforcement* .................. 20

CONCLUSION.............................................................................................................. 21

i

## TABLE OF AUTHORITIES

**Cases**

*Addington v. Texas*, 441 U. S. 418, 423 (1979) ................................................................ 10

*Changzhou Hawd Flooring Co., Ltd. v. United States,* 44 F. Supp. 3d 1376, 1390 (Ct. Int'l Trade 2015) ........................................................................................................................ 17

*Chevron U. S. A. Inc. v. Natural Resources Defense Council, Inc*., 467 U. S. 837, 843-844 (1984) ................................................................................................................................ 17

*China Diesel Imports v. United States*, 18 C.I.T. 515, 518, 855 F. Supp. 380, 383 (1994) .......... 5

*Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 542, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985) ................................................................................................................................ 8

*Decker v. Nw. Envtl. Def. Ctr.,* 568 U.S. 597, 609 (2013) .......................................................... 5

*In re Winship*, 397 U.S. 358, 370 (1970) ................................................................................ 10

*International Business Machines Corp. v. US,* 201 F. 3d 1367, 1372 (Fed. Cir. 2000) ............... 5

*Jiaxing Brother Fastener Co. v. United States*, 380 F. Supp. 3d 1343, 1356 (Ct. Int'l Trade 2019) ................................................................................................................................ 17

*LaChance v. Erickson,*  522 U.S. 262, 266, 118 S. Ct. 753, 139 L. Ed. 2d 695 (1998) ............... 8

*Manhattan Gen. Equip. Co. v. Comm'r of Internal Revenue*, 297 U.S. 129, 134 (1936) ............. 5

*Mathews v. Eldridge*, 424 U. S. 319, 344 (1976) ..................................................................... 10

*Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976) .......................... 8

*Muwwakkil v. Office of Personnel Mgt.*, 18 F. 3d 921, 924 (Fed. Cir. 1994) ................................. 5

*Precision Specialty Metals, Inc. v. United States,* 25 C.I.T. 1375, 1388, 182 F. Supp. 2d 1314, 1328 (Ct. Int'l Trade 2001) ................................................................................................. 15

*Ralls Corp v. Committee on Foreign Investments in the United States,* 411 U.S. App. D.C. 105, 758 F.3d 296 (D.C. Cir. 2014) .......................................................................................... 8, 9

*Santosky v. Kramer,* 455 US 745, 755 (1982) ......................................................................... 10

*Steel Auth. of India v. United States*, 25 C.I.T. 472, 476, 146 F. Supp. 2d 900, 905-06 (2001) ..... 5

*Sullivan v. Zebley,* 493 U.S. 521 (1990) ............................................................................. 10, 11

*United States Auto Parts Network, Inc. v. United States*, 319 F. Supp. 3d 1303,1310-11 (2018).. 8

*United States v. Optrex America, Inc.*, 30 C.I.T. 650, 667 (Ct. Int'l Trade 2006) ....................... 15

**Statutes**

19 U.S.C. § 1307 ................................................................................................................ passim

19 U.S.C. § 307 ............................................................................................................... 19, 20

**Other Authorities**

*CBP Announces May 2021 Operational Update* (June 9, 2021) ................................................. 18

Congressional Research Service (CRS) ............................................................................... 19, 20

Defense Production Act of 1950 .............................................................................................. 9

*Forced Labor Imports: DHS Increased Resources and Enforcement Efforts, but Needs to Improve Workforce Planning and Monitoring* (Oct. 27, 2020) ................................................. 19

*Forced Labor: CBP Should Improve Communication to Strengthen Trade Enforcement* (Mar. 1, 2021) ................................................................................................................................ 19

*Hoshine Silicon Industry Co. Ltd Withhold Release Order Frequently Asked Questions* (Jul. 27, 2001) ................................................................................................................................ 20

Ruling No. HQ 961505 (Aug. 20, 1998) ................................................................................. 15

The Customs Modernization Act of 1993 (Pub. L. 103-182, 107 Stat. 2057) ............................. 15

The Frederick Douglass Trafficking Victims Prevention and Protection Reauthorization Act of
   2018............................................................................................................................. 19
*Trade Statistics*................................................................................................................. 2
U.S. Customs and Border Protection, *Forced Labor* (Aug. 17, 2021) ......................................... 18
*U.S. Imports of Products of Forced Labor: Overview and Issues for Congress* (Feb. 1, 2021) .. 20

**Regulations**

19 CFR § 12.42 through 12.45.............................................................................................. 3, 7
19 CFR § 12.42(e) (2021).................................................................................................... 11
19 CFR § 12.42(f) (2021).................................................................................................... 11
19 CFR § 12.42(g) (2021).................................................................................................... 11
19 CFR § 12.43 (2021) ....................................................................................................... 3

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. TIMOTHY M. REIF, JUDGE

|  |  |  |
|---|---|---|
| VIRTUS NUTRITION, LLC, | : | |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | Court No. 21-00165 |
| | : | |
| v. | : | |
| | : | |
| THE UNITED STATES, | : | |
| | : | |
| Defendant. | : | |
| | : | |

### INTEREST OF *AMICUS CURIAE*

The American Apparel & Footwear Association ("AAFA" or "the Association") is the national trade association representing apparel, footwear, and other sewn products companies, and their suppliers, directly employing 3 million American workers, which compete in the global market and import goods into, and export goods out of, the United States. The Association members contribute more than $350 billion in annual U.S. retail sales.

Our industry does not tolerate forced labor. Our members devote extensive time and resources to prevent, detect, and eradicate forced labor so it does not infect our supply chains. These efforts are part of comprehensive internal compliance programs to ensure that imported goods comply with all the legal requirements imposed by U.S. Customs and Border Protection ("CBP") and other government agencies. These policies are continuously reviewed and updated and include third-party audits, reviews and inspection of goods and facilities, information provided by outside stakeholders, and the development and implementation of other best practices and innovative approaches to support these efforts. In addition to implementing rigorous protocols at first tier factories (those associated with the final production), AAFA members are also

implementing these protocols at suppliers (and their suppliers) to those factories, going many steps back into the supply chain.

We and our members partner extensively with the U.S. government and other key stakeholders to amplify and expand efforts to end the forced labor scourge globally. We actively support the implementation of the U.S. forced labor statute and believe an effective partnership between CBP and industry is vital to amplify CBP's enforcement of the forced labor statute to ensure that enforcement is smart, transparent, targeted, and effective.

Unfortunately, CBP's enforcement of the U.S. forced labor statute has instead been marked by lack of due process, an unreasonable standard of evidence, lack of transparency, and arbitrary and capricious decisions.  This significantly reduces the effectiveness of CBP's enforcement by creating huge inefficiencies and propagating an unfair system that unreasonably detains and excludes licit goods.

Besides being unfair, this chaotic process appears to be an abdication of CBP's mandate to facilitate legitimate trade. As stated by CBP, "Among other critical mission sets, CBP is charged with balancing the facilitation of legitimate trade that supports economic growth with the duty to shield the American public and businesses from unsafe products, intellectual property theft, and unfair trade practices."  U.S. Customs and Border Protection, *Trade Statistics*. [1]

Further, because the system CBP has constructed inefficiently detains and focuses attention on a large quantity of licit goods, we are concerned that CBP's limited resources are depleted for the purpose of detecting, examining, detaining, or excluding illicit product, including product made in whole or in part with forced labor.

---

[1] https://www.cbp.gov/newsroom/stats/trade (last visited Aug. 19, 2021).

We respectfully submit that this *Amicus* brief would be of assistance to the Court because AAFA members have also experienced unwarranted exclusions of merchandise from entry by CBP that are like those described in the plaintiff's complaint.  While this *Amicus* is not privy to the specific facts supporting plaintiff's claim, it does align with the *prima facie* description of the treatment the plaintiff has experienced as a result of detentions, namely lack of due process, an unreasonable standard of evidence, a lack of transparency, and arbitrary and capricious decisions.

## STATEMENT OF THE CASE

19 U.S.C. § 1307 (Section 1307) prohibits entry into the U.S. of "[a]ll goods, wares, articles, and merchandise mined, produced, or manufactured wholly or in part in any foreign country by convict labor or/and forced labor or/and indentured labor under penal sanctions."  The statute further provides that "the Secretary of the Treasury is authorized and directed to prescribe such regulations as may be necessary for the enforcement of this provision."  19 U.S.C. § 1307 (2021).  These implementing regulations are set out in the Customs regulations at 19 CFR § 12.42 through 12.45.  In particular, Section 12.43 establishes a process by which an importer of any article detained due to a Withhold Release Order (WRO) can contend that the article was not manufactured in any part with the use of any class of labor described in Section 1307.  19 CFR § 12.43 (2021).

The U.S. apparel and footwear industry embraces its moral and legal obligation to prevent, detect, and eradicate forced labor in our supply chains. The industry has spent decades developing and implementing policies and practices to keep forced labor from infecting our supply chains. Our efforts are complemented by smart, transparent, targeted, and effective enforcement by CBP.

3

Unfortunately, this partnership has faltered because CBP has created a system that lacks due process, that lacks transparency, that is arbitrary and capricious, and that imposes an impossible burden of proof for importers to demonstrate that their goods are not made in whole or in part with forced labor. Not only does this undermine industry efforts, but it makes CBP ineffective at enforcing the forced labor statute.

## SUMMARY OF ARGUMENT

CBP's enforcement of the U.S. forced labor statute suffers from lack of due process, an unreasonable standard of evidence, lack of transparency, and arbitrary and capricious decisions. The initial failure begins with the introduction, by CBP, of a concept of uncertainty to detain and exclude merchandise, far exceeding the clear statutory meaning of the forced labor statute that requires certainty. Further, CBP routinely ignores exculpatory evidence provided by importers, provides no rationale why such evidence is deficient, makes exhaustive documentation requests then complains that it gets too much information, and fails to disclose enforcement targets, or the evidence used to identify those targets, so the industry can avoid those bad supply chain actors. This non-statutory reliance on uncertainty to detain and exclude a large quantity of merchandise, coupled with a process riddled with procedural flaws, creates a system that unfairly targets trusted traders while overburdening CBP's limited resources to enforce this vitally important law.

## ARGUMENT

### A. CBP's Regulations Introduced Uncertainty to Section 1307 Enforcement Actions Even Though the Statute Requires Certainty

19 U.S.C. § 1307 provides that:

All goods, wares, articles, and merchandise mined, produced, or manufactured wholly or in part in any foreign country by convict labor or/and forced labor or/and indentured labor under penal sanctions shall not be entitled to entry at any of the

> ports of the United States, and the importation thereof is hereby prohibited, and the Secretary of the Treasury is authorized and directed to prescribe such regulations as may be necessary for the enforcement of this provision.

19 U.S.C. § 1307 (2021).  As stated by this Court in *Steel Auth. of India v. United States*, 25 C.I.T. 472, 476, 146 F. Supp. 2d 900, 905-06 (2001),  "[t]he first tool of statutory construction is the plain meaning of the text, which is the final expression of Congress's intent. . . .  If the statute is clear, 'that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'" (internal citations omitted).  *See also Manhattan Gen. Equip. Co. v. Comm'r of Internal Revenue*, 297 U.S. 129, 134 (1936) ("A regulation which does not [effect the will of Congress], but operates to create a rule out of harmony with the statute, is a mere nullity"); *Decker v. Nw. Envtl. Def. Ctr.,* 568 U.S. 597, 609 (2013) ("regulations, in order to be valid, must be consistent with the statute under which they are promulgated"); *International Business Machines Corp. v. US,* 201 F. 3d 1367, 1372 (Fed. Cir. 2000) ("We begin with the language of the statute itself. If that language is clear and unambiguous, then it controls, and we need not—indeed we may not—go further."); *Muwwakkil v. Office of Personnel Mgt.*, 18 F. 3d 921, 924 (Fed. Cir. 1994) ("When statutory interpretation is at issue, the plain and unambiguous meaning of a statute prevails.").

The statute unambiguously prohibits only the importation of articles that are in fact "mined, produced, or manufactured wholly or in part in any foreign country by convict labor or/and forced labor or/and indentured labor under penal sanctions."   The statute requires certainty to prohibit. *See China Diesel Imports v. United States*, 18 C.I.T. 515, 518, 855 F. Supp. 380, 383 (1994) ("As the discussion of [19 U.S.C. § 1307] and its legislative history reveal, there are very specific requirements for exclusion of goods under 19 U.S.C. § 1307 -- requirements that are suitable for adjudication").

The statute, by its unambiguous terms, necessarily requires evidence and a determination that the specific articles that are presented for importation were "mined, produced, or manufactured" using the proscribed labor before their importation may be prohibited. This is a factual determination, specific to the imported merchandise, that must be made before such merchandise may be found to fall within the statute's prohibition. The statute cannot be interpreted to relieve the Secretary or CBP from making the factual determination, based on evidence regarding the specific articles presented for importation, that is a prerequisite to exclusion. Yet that is exactly what CBP has done in these exclusion cases.

CBP's regulations implementing Section 1307 impermissibly introduce uncertainty, specifically the concept of detaining cargo based on inconclusive evidence rather than certainty. Further, no evidence is provided by CBP to support the exclusion and the importer is afforded no opportunity to rebut such evidence, if indeed any such evidence even exists. Instead, association members are provided the opportunity to present strong evidence showing that a detained shipment does not contain products violative of 19 U.S.C. § 1307. Such members, like the plaintiff, are often informed by CBP that the evidence presented by the importer was insufficient, without any elaboration by CBP on the specific insufficiency or the level of the supply chain where the insufficiency exists or providing any context against which that alleged insufficiency is measured. This perfunctory response to importers' extensive evidence in cases of WRO detained goods results in the continual and unjustified denial of entry of licit goods.

To be clear, AAFA members' concerns are with the uncertainty in the enforcement process, not the goal of prohibiting goods made with forced labor, which we fully support. On that basis, a rebuttal to such detention should also be measured by a reasonable standard and not absolute certainty. Congress's "charge" to balance the fostering of legitimate trade with efforts to identify

and interdict illicit trade is not fulfilled when CBP issues a withhold release order (WRO) because information available to it "reasonably" indicates illicit merchandise is likely to be imported, but then does not afford an importer caught up in the broad WRO to recover its property by presenting information that "reasonably" indicates its legitimate source. In this highly unbalanced approach, CBP can exclude the importer's property from importation without providing the importer any actual evidence of its illegitimate source.  The importer's only recourse is to provide evidence that somehow satisfies a standard of proof that seems to rise to the level of absolute certainty, a standard that CBP will not even explain. In a balanced, reasonable approach that comports with American notions of fairness and due process, CBP should be required to present the importer with the evidence in its possession supporting the exclusion of the specific merchandise and the standard of proof necessary for the importer to rebut CBP's undisclosed evidence and persuade CBP to permit importation of that merchandise.

## B.  CBP's System to Detain and Exclude Goods Lacks Procedural Due Process

To date, it is *Amicus'* understanding that CBP has not revealed to anyone outside the agency what evidence it has gathered to support any detentions of cargo under Section 1307, nor has it identified a standard of proof that it will accept to rebut a WRO detention.[2]  The net result of the seemingly arbitrary decisions by CBP is to deprive the importers of their property; a prohibition from importation of the property owned by the importer effectively renders it worthless in many circumstances. These decisions to deprive the importers of their property, without affording a meaningful hearing or providing the importer with the evidence claimed to support the exclusion

---

[2] The standard to rebut a more conclusive CBP published "Finding" is enumerated in 19 CFR 12.42(f) as "satisfactory evidence."  The regulations do not enumerate the standard of evidence required to rebut a less conclusive WRO.

deprives the importer of the due process to which they are entitled by the United States Constitution.

As this Court noted in *United States Auto Parts Network, Inc. v. United States*, 319 F. Supp. 3d 1303,1310-11 (2018), "The Fifth Amendment prohibits the deprivation of life, liberty, or property without due process of law. U.S. Const. amend. V. 'The core of due process is the right to notice and a meaningful opportunity to be heard.' *LaChance v. Erickson*,  522 U.S. 262, 266, 118 S. Ct. 753, 139 L. Ed. 2d 695 (1998) (*citing Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 542, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985))."" In the case of these Section 1307 exclusions, there are no meaningful hearings in which the importer can present their evidence and refute any evidence in the possession of CBP.

Due process ordinarily requires that procedures provide notice of the proposed official action and "the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976).  Importers cannot meaningfully participate in the WRO process when CBP fails to advise the importer of the evidence the government considered in making its determination that goods fall within the scope of an WRO.  While CBP generally permits importers to submit information supporting the fact the goods are not subject to the WRO, without knowledge of the evidence the government relied on in making that determination, the importer has no meaningful opportunity to review and rebut any such evidence.

For example, in *Ralls Corp v. Committee on Foreign Investments in the United States,* 411 U.S. App. D.C. 105, 758 F.3d 296 (D.C. Cir. 2014), a Delaware corporation owned by two Chinese nationals purchased four other U.S. owned companies that were developing windfarms in Oregon. The transaction was reviewed by the Committee on Foreign Investments in the United States

(CFIUS), an Executive Branch committee created by the Defense Production Act of 1950 and chaired by the Secretary of the U.S. Treasury Department. CFIUS determined that the purchase threatened national security and, on its recommendation, the President ordered Ralls Corporation to divest itself of the windfarms it had acquired. Ralls challenged this order in Federal District Court for the District of Columbia, which affirmed the order. On appeal, the U.S. Court of Appeals for the District of Columbia held that the corporation was denied due process because it was never advised of the nature of the government's concern with the acquisitions, nor was Ralls advised of the evidence considered in making the determinations that the purchase threatened national security nor provided an opportunity to rebut that evidence. *Id.* at 319.

Even if Virtus is ultimately successful in causing the government to reveal the information on which its WRO decision was based during the course of this litigation, that fact will not help importers who do not have the financial means to litigate the CBP WRO decision. What is required is a decision in this case that procedural due process requires CBP to reveal any non-classified information used to support a WRO decision and allow the importer an opportunity to review and rebut any such specific information at the administrative level.

### C. CBP Has Imposed an Unreasonable Standard of Evidence.

CBP has imposed unreasonable, and at times nonexistent, standards of evidence for importers in responding to the WRO. This is a major hardship for importers as there is no evidentiary standard or guidance from CBP to identify the sorts of evidence that CBP will require in any given case. The Supreme Court has held that:

> The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication.

*Addington v. Texas*, 441 U. S. 418, 423 (1979) *quoting In re Winship*, 397 U.S. 358, 370 (1970) (Harlan, J., concurring).  *See also Santosky v. Kramer,* 455 US 745, 755 (1982) ("Addington teaches that, in any given proceeding, the minimum standard of proof tolerated by the due process requirement reflects not only the weight of the private and public interests affected, but also a societal judgment about how the risk of error should be distributed between the litigants"). Moreover, "[s]tandards of proof, like other 'procedural due process rules[,] are shaped by the risk of error inherent in the truth-finding process as applied to the generality of cases, not the rare exceptions.'" *Santosky* at 757, *quoting Mathews v. Eldridge*, 424 U. S. 319, 344 (1976).

### 1.  *Importers are operating in a vacuum created by CBP's flawed regulations.*

In *Sullivan v. Zebley,* 493 U.S. 521 (1990), the Supreme Court considered whether regulations promulgated by the Secretary of Health and Human Services "exceeded the Secretary's statutory authority and whether [the regulations] are arbitrary and capricious."  *Id.* at 528.  The case involved a child-disability claim under the Supplemental Security Income ("SSI") Program. The implementing statute set out a statutory definition for "disability," applicable to adults and children suffering from "any medically determinable physical or mental impairment of *comparable severity*" (emphasis added).  *Id.* at 524.  To effectuate the statute, the Secretary of Health and Human Services ("the Secretary") set out in regulations a five-step test to determine whether a claimant was disabled.  *Id.* at 525.  The first two steps involve threshold determinations that the claimant was not presently working and had an impairment satisfying certain duration and limits on ability to work requirements.  *Id.* The third step involved comparing medical evidence of a claimant's impairment to a list of impairments previously determined to be severe enough to preclude any gainful work.  *Id.*  If a "claimant's impairment matches or is 'equal' to one of the listed impairments, he qualifies for benefits without further inquiry."  *Id.*  For children, the review

would end there, but for adults, if there was no "match," there were an additional two steps to potentially qualify for a benefit.  *Id.*  The Court found that this divergent test for adult and child claimants effectively establish "a higher level of severity than the statutory standard" for children. *Id.* at 532.  Consequently, the Court found that "[t]he child-disability regulations are simply inconsistent with the statutory standard of 'comparable severity.'"  *Id.* at 536.

CBP, in drafting its own regulations to implement Section 1307, casts a wide net by setting for itself an initial evidentiary standard of "reasonable but not conclusive evidence" to issue a WRO, a standard that CBP itself admits is relatively low. [3]  19 CFR § 12.42(e) (2021).  CBP has the authority to escalate the level of review by subsequently publishing a Finding when it determines that merchandise is subject to Section 1307.  19 CFR § 12.42(f) (2021).  A Finding may lead to CBP's most extreme remedy, seizure, if not rebutted with "satisfactory evidence."  19 CFR § 12.42(g) (2021).

The chart below illustrates the lack of evidentiary standards at various stages of Section 1307 enforcement as well as the inappropriately high standard that CBP has applied to importers seeking to show that their supply chain does not include WRO entities.  For example, a Finding, which may result in a seizure, may be rebutted by the submission of "satisfactory" evidence.  In contrast, based on industry experience, CBP has established a *de facto* "beyond a reasonable doubt" standard to rebut a WRO detention.

---

[3] For instance, in an August 10, 2020, presentation by the US government, CBP indicated that the burden of proof to trigger a WRO is very low and much lower than probable cause.

| Action | Regulatory citation | Is There a Published Standard of Evidence? | What is Standard of Evidence? | Evidentiary Scale |
|---|---|---|---|---|
| WRO Issued | 19 CFR 12.42(e) | ✔ | Reasonable but not conclusive | 1 |
| CBP Selects Certain Unnamed Entities for Shipment Detention Pursuant to WRO | ❌ | ❌ | Absent | 2 |
| Rebuttal of WRO detention | 19 CFR 12.43(a) & (b) | ❌ | Absent, but in practice is beyond reasonable doubt | 6 |
| Finding Issued | 19 CFR 12.42(f) | ❌ | Absent | 3 |
| CBP Selects Certain Unnamed Entities for Shipment Detention Pursuant to Finding | ❌ | ❌ | Absent | 4 |
| Rebuttal of Finding detention | 19 CFR 12.42(g) | ✔ | Satisfactory evidence | 5 |

 ❌ - NO   ✔ - YES

### 2. *CBP's continuously shifting documentary requirements lead to greater confusion.*

In the vacuum created by this frustrating lack of an evidentiary standard or guidance, AAFA members strive to provide all conceivable evidence that "reasonably" or "satisfactorily" rebuts a detention, even while CBP seemingly continues to move the goal posts, constantly changing what evidence is required, or in what form it should be presented to CBP, such as whether all documents submitted must be fully translated into English, or whether any documents submitted must include a narrative that explains the documents. For example, CBP has repeatedly indicated that certain non-existent types of documents are required to rebut a WRO detention. For instance, all CBP detention notices for cotton goods indicate that the importer should provide, among other documents, "Supporting documents related to employees that picked the cotton, timecards or the like, wage payment receipts, and daily process reports that relate to the raw cotton sold to the yarn producer." Such wage receipts are not available in all cases and in many circumstances are not necessary to show the fiber originates from non-WRO sources.

In another example, in the case of a CBP WRO on cotton, CBP repeatedly stated in public fora that even when the importer provided clear evidence certifying that the cotton used in the shipment did not come from the proscribed region and was actually used in the manufacturing of

12

the subject product, CBP rejected the evidence, claiming it did not conclusively prove that the cotton was not somehow surreptitiously replaced, or mingled, with proscribed cotton somewhere in the supply chain.  Not only is this a completely unreasonable expectation, such evidence would certainly be well beyond the level of "reasonable" or "satisfactory."

Because CBP has established a completely opaque process, it appears that they are either ignoring the evidence presented by the importer or requiring evidence that rises to an impossible level of absolute certainty.

### 3. *CBP provides little to no feedback to importers during the WRO administrative process.*

Even when importers strive to provide reasonable or satisfactory evidence to rebut a detention, CBP provides little to no meaningful feedback.  On many occasions, importers have submitted the types of documents CBP claims are required to rebut a WRO detention, and after weeks to months reviewing these documents, CBP responds simply that those documents are insufficient without any explanation for the insufficiency.  Indeed, in public fora, CBP has even claimed that these evidence submissions are a mere "data dump" of documents somehow intended to hide the "truth."

Instead of engaging in a fair and reasonable dialogue with the importer to review evidence, CBP instead renders a decision veiled in secrecy.  For example, CBP targeted shipments from certain manufacturers unidentified in the enumerated WROs.  CBP's standard of proof for selecting these targets and the available evidence against them (if any) is unclear, and, more importantly, not shared with either the importer or the larger trade community. While both AAFA and its members have argued that sharing such information would be helpful, and would greatly enhance our members' own due diligence, CBP has publicly stated that there is no point in sharing

the supplier names because the supplier will just change their name.[4]  This argument is completely nonsensical. Our members are smart enough to realize a product is being shipped from the same facility even if the name is changed. Further, not sharing this critical information completely undercuts the whole purpose of the forced labor statute, preventing the import of products made with forced labor, because other importers will continue to source from the supplier, not knowing that CBP has evidence that the supplier uses forced labor.

There is no reason why CBP cannot provide feedback during a detention review to all importers who submit traceability documents to attempt to clear goods detained under a WRO. Instead of potentially resolving any issues in a single administrative process, after providing a limited response, CBP tells importers that if they disagree and want a further explanation, they engage in a second proceeding by filing a protest and Application for Further Review ("AFR"). CBP is under no time constraints to act on a protest, and any decision to grant an AFR is discretionary.  On many occasions, protests and AFRs are denied by field officers, leaving the importer without the desired explanation.  The importer's recourse then, if it has the resources, is a legal action in this Court to challenge the exclusion.

The court should hold that CBP must issue specific guidance as to what information importers should submit to contest a WRO detention and should then follow its own guidance. More specifically, the Court should direct CBP to provide the importer the evidence CBP used to detain the shipment. Further, if the evidence presented by the importer is *prima facie* evidence that the goods were not produced with forced labor (or by any named entity or in any named region),

---

[4] At a June 16, 2021 panel hosted by Arent Fox and the New York State Bar Association on forced labor, Therese Randazzo, the Director of the Forced Labor Division at CBP, stated, "We actually don't publish a list of companies because this is what happens… If we publish and say 'OK, these are the companies that are using forced labor,' then we just don't see those companies anymore. They change their names and become someone else. So, a list would constantly be out of date and so then you could say, 'Well, I used a company that wasn't on the list.' Well, that could be the company that yesterday was on the list, now it has a new name and it's on the list again."

then it should be CBP that has the burden of going forward to establish the contrary and to provide the importer with a meaningful hearing including an opportunity to rebut the evidence on which CBP proposes to exclude the merchandise.  If CBP has no reasonable evidence that the specific articles violate 19 U.S.C. § 1307, and the importer has presented a *prima facie* case they are not violative, the goods should be permitted entry.

### D.  CBP's Process Lacks Transparency

CBP's lack of transparency and fairness in its implementation of 19 U.S.C. § 1307 has created chaos in the industry.  Plaintiff's experience with CBP's failure to properly consider its exculpatory evidence is not the exception to the rule, but rather the norm. Intervention by the Court is crucial because CBP has had ample time to provide evidentiary standards and due process to importers but has failed to do so.  The Customs Modernization Act of 1993 (Pub. L. 103-182, 107 Stat. 2057) ("the Mod Act") advanced two central concepts: 1) informed compliance, and 2) reasonable care.  Informed compliance is a shared responsibility between CBP and the import community, wherein CBP effectively communicates its requirements to the trade, and the trade regulates its activities in accordance with U.S. laws and regulations.  *See* Ruling No. HQ 961505 (Aug. 20, 1998).  Informed compliance requires "[CBP] to inform the trade community of its legal obligations through sharing and communication of information."  *United States v. Optrex America, Inc.*, 30 C.I.T. 650, 667 (Ct. Int'l Trade 2006).  *See also Precision Specialty Metals, Inc. v. United States,* 25 C.I.T. 1375, 1388, 182 F. Supp. 2d 1314, 1328 (Ct. Int'l Trade 2001).

In enforcing regional WROs (those that do not name a specific entity), CBP has seemingly selected manufacturers it believes are high risk and has detained cargo from those manufacturers.  CBP has not publicly named these manufacturers.  Further, CBP has released cargo from these

same manufacturers if it is not linked to a commodity enumerated in the regional WRO. This indicates that CBP does not believe these manufacturers, themselves, are guilty of forced labor. This lack of transparency is especially troubling in the current enforcement environment in which these unnamed manufacturers are considered guilty until proven innocent on the basis of evidence that CBP will not reveal, even in the face of robust evidence to the contrary. CBP acts as police, judge, and jury for unidentified allegations against unnamed entities with zero oversight.

To its credit, CBP has provided a wealth of information on its website and in public fora. However, it is unwilling to communicate about critical information such as:

- Which unnamed manufacturers are the target of CBP's enforcement concerns?

- What evidence does CBP have in relation to those manufacturers who are not, themselves, named in a WRO?

- What evidence would satisfy CBP of no supply chain connection to a WRO entity?

- What are the "insufficiencies" in each importer's traceability submission?

- How does an importer's evidence compare to CBP's evidence in any given case?

- How is an importer supposed to prove a negative?

- What is the standard of evidence CBP requires to approve release of goods suspected of being subject to a WRO that was issued on the basis of "reasonable but not conclusive" evidence and for which CBP has identified target manufacturers on the basis of an unidentified standard of proof?

CBP is willing to communicate, but not about critical information for importers to engage in any meaningful effort to avoid bad actors and identify good ones. CBP demands greater transparency and traceability from importers but does not meaningfully engage in transparency itself. The Association has repeatedly urged CBP to share with industry the evidence gathered,

16

and the evidentiary thresholds used, to impose a WRO, to detain specific cargo under an WRO, and to evaluate against an importer's evidence. Failure to do so deprives importers of their due process and/or establishes an unreasonable evidentiary standard when attempting to import goods into the United States.

The process for considering an importer's exculpatory evidence must be reasonable and rational and should contain guidance as to what is necessary to satisfy CBP.  The evidence presented by an importer should be measured against the evidence, if any, that CBP or any other government agency possesses.

### E.  CBP's Process is Arbitrary and Capricious

CBP's failure to provide clear and reasonable evidentiary standards render its Section 1307 enforcement actions arbitrary and capricious.  An agency's actions are arbitrary and capricious if:

> [T]he agency offers insufficient reasons for treating similar situations differently." A determination is also arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

*Jiaxing Brother Fastener Co. v. United States*, 380 F. Supp. 3d 1343, 1356 (Ct. Int'l Trade 2019) (internal citations omitted).  *See also Changzhou Hawd Flooring Co., Ltd. v. United States,* 44 F. Supp. 3d 1376, 1390 (Ct. Int'l Trade 2015).  Similarly, "[i]If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight *unless they are arbitrary, capricious, or manifestly contrary to the statute*"  (emphasis added). *Chevron U. S. A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U. S. 837, 843-844 (1984).

### 1. *CBP forced labor enforcement actions favor quantity over quality*

CBP is under pressure to demonstrate actions by way of detentions and exclusions of cargo from entering the United States.  This pressure has seemingly led to a flawed WRO review process, or complete lack thereof, demonstrating that CBP has no interest in culling the catch caught up in the wide WRO net by considering the case-by-case fact basis for each exclusion.  CBP's own press releases and publications illustrate this potential conflict.

For example, on June 9, 2021, CBP circulated statistics showing that the agency "continues to aggressively…prevent goods made by forced labor from entering the U.S. commerce" and it presented as evidence that in the FY 2021, CBP had targeted more than 1,200 shipments arriving in the U.S., detained 674 shipments, and "deterred the remainder of the targeted shipments from entering the United States." U.S. Customs and Border Protection, *CBP Announces May 2021 Operational Update* (June 9, 2021).[5] CBP believes that showing results means detaining and excluding shipments and, as such, it will not be persuaded to accord due process to importers and to establish reasonable evidentiary standards without judicial intervention. CBP is publishing the detention statistics on its website.  U.S. Customs and Border Protection, *Forced Labor* (Aug. 17, 2021).[6]

The metrics CBP is reporting and the language CBP uses to report these metrics imply that all of the targeted, detained, or "deterred" shipments are actually connected to forced labor.  In fact, it is the experience of AAFA members that many of these shipments fall in one of two categories:

---

[5] https://www.cbp.gov/newsroom/national-media-release/cbp-announces-may-2021-operational-update.
[6] https://www.cbp.gov/trade/programs-administration/forced-labor.

- Shipments for which the importer has provided full traceability to entities outside the scope of any WRO but CBP has indicated the traceability was insufficient based on its current improper evidentiary standards; or

- Shipments the importer has proactively determined to export without fighting CBP's exclusion of the cargo because the importer understands that the odds of proving admissibility to CBP's satisfaction are impossibly low.

CBP's reliance on these statistics suggests that CBP is measuring enforcement through quantity rather than quality.

The Government Accountability Office was requested to review the status of DHS resources for forced labor enforcement and made recommendations for improvements in various reports. *See* U.S. Government Accountability Office, *Forced Labor Imports: DHS Increased Resources and Enforcement Efforts, but Needs to Improve Workforce Planning and Monitoring* (Oct. 27, 2020)[7] and U.S. Government Accountability Office, *Forced Labor: CBP Should Improve Communication to Strengthen Trade Enforcement* (Mar. 1, 2021).[8]   The Frederick Douglass Trafficking Victims Prevention and Protection Reauthorization Act of 2018 included a provision that GAO review CBP's efforts to enforce 19 U.S.C. § 307.  The Congressional Research Service (CRS) said in a May 2021 report, "While congressional action to close the Section 307 loophole was widely welcomed, some observers question whether CBP is effectively making use of the change."

A February 2021 CRS report indicates in part, "Some Members of Congress have expressed interest in ensuring CBP actively applies Section 307 Some observers view recent enforcement actions as inadequate in eliminating U.S. imports of forced labor, and recommend

---

[7] https://www.gao.gov/products/gao-21-106.
[8] https://www.gao.gov/products/gao-21-259.

greater clarity and guidance in CBP decisions and requirements, as well as allocation of greater resources." The Congressional Research Service, *Section 307 and U.S. Imports of Products of Forced Labor: Overview and Issues for Congress* (Feb. 1, 2021).[9] In an August 2018 CBP presentation, it indicated that the agency was being challenged to enforce these laws at the highest level of the agency.

### 2. *CBP inconsistently applies* de minimis *standards in WRO enforcement*

Moreover, CBP appears to treat different WROs to different standards. In a July 29, 2021, update to its website, CBP claims that it applies a *de minimis* standard when determining whether to detain goods under a WRO. U.S. Customs and Border Protection, *Hoshine Silicon Industry Co. Ltd Withhold Release Order Frequently Asked Questions* (Jul. 27, 2001).[10] In explaining its approach to the WRO on certain silica-based products, CBP indicates, "If the contribution of prohibited labor to the whole product is insignificant (both from a quantitative and a qualitative perspective), CBP may consider the product outside the scope of the statute. For example, if prohibited labor is used to manufacture a single part in the engine of a car, the contribution of the prohibited labor to the final product (the car) may be considered "*de minimis*" for purposes of Section 1307. But, if the part is an essential part of the engine or the manufacture of the part comprises a substantial portion of the total labor, CBP may deem the car to be within the scope of Section 1307."

In practice, however, it is the experience of AAFA members that CBP does not appear to actually apply a *de minimis* standard when reviewing evidence in relation to goods detained under a cotton WRO. When presented with documents that trace the finished goods back to the origin

---

[9] https://fas.org/sgp/crs/misc/R46631.pdf.
[10] https://www.cbp.gov/trade/programs-administration/forced-labor/hoshine-silicon-industry-co-ltd-withhold-release-order-frequently-asked-questions.

of the fiber, with inventory connections at each level of the supply chain and information about the materials quantity and utilization (rate of consumption), CBP will respond that the importer hasn't proven no commingling or contamination.  Given that the importer has provided all information about what did go into the goods and why it was sufficient to cover 100% of the production and what inventory controls were in place, it seems as though CBP is asserting that the importer must prove that no contamination of any amount could have possibly occurred.  That's not an analysis that follows a *de minimis* standard.  That's an analysis that requires perfection and proof of a negative, a standard that CBP continues to apply with cotton but does not apply with respect to silica.

**CONCLUSION**

The U.S. apparel and footwear industry does not tolerate forced labor in our supply chains and fully supports Congress's goal to prevent goods made with forced labor from entering the United States. We believe a strong partnership with CBP is vital to ensure that this statute is efficiently and effectively implemented and further believe that effective enforcement requires clear evidentiary standards, due process, and transparency, consistent with U.S. jurisprudence and Congressional intent. However, CBP's enforcement of the U.S. forced labor statute has suffered from lack of due process, an unreasonable standard of evidence, lack of transparency, and arbitrary and capricious decisions.  The Customs Modernization Act imposes a greater obligation on CBP to provide the public with improved information so that under the auspices of shared responsibility, importers can exercise reasonable care in customs compliance matters.  This is a clear mandate for transparency.  Yet CBP has selected confidential targets, stopping all cargo from those targets on the basis of evidence it will not reveal, has not provided meaningful guidance to the public on requirements to release the cargo, and has seemingly imposed an unreasonable standard of

21

evidence for importers to prove the cargo is not connected to any WRO entity.  CBP has not

balanced its mission to facilitate legitimate trade with its enforcement efforts in the WRO context.


Respectfully submitted,

Patrick D. Gill
SANDLER, TRAVIS & ROSENBERG, P.A.
*Attorneys for Amicus Curiae*
675 Third Avenue, Suite 1805-06
New York, NY  10017
(212) 549-0156

By: /s/Patrick D. Gill
 Patrick D. Gill


Dated:  August 26, 2021